IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>APPROXIMATELY $83,513 IN UNITED )<br>STATES CURRENCY SEIZED ON )<br>FEBRUARY 20, 2022 IN CHARLOTTE, )<br>NORTH CAROLINA ) | **Civil No. 3:22-cv-00465** |

<u>**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***</u>

NOW COMES the United States of America, Plaintiff herein, by and through Dena J. King, United States Attorney for the Western District of North Carolina, in a civil cause of forfeiture, and respectfully states the following:

**INTRODUCTION**

1. This is a civil action *in rem* against approximately $83,513 in United States currency seized on February 20, 2022, in Charlotte, North Carolina (the "Currency").

2. Late at night on February 20, 2022, Ashia Robinson got out of the passenger's side of a car in front of her house and then shot a handgun multiple times at the vehicle as it drove away. One bullet struck a neighboring home with four occupants inside, including two children. Law enforcement responded, and during the investigation, executed a search warrant of Robinson's home, discovering, *inter alia*, among her house and vehicles: (a) a fully-loaded FN 509 pistol, (b) an open Glock gun-box with two magazines inside but the corresponding Glock 19 and one magazine missing, (c) roughly nine pounds of marijuana, (d) drug trafficking paraphernalia such as a digital scale and money counter, and (e) approximately $83,513 in United States currency. Robinson was arrested and charged with possession with intent to manufacture/sell/distribute marijuana and discharge of a weapon into occupied property.

1

3. Robinson asserts the Currency is the proceeds of her women's clothing business, Victrexx Vivens. But any legitimately-derived business proceeds would have a paper trail, and as such, prior to filing suit, the Government requested, and Robinson voluntarily provided, documents she contends would support a legitimate source of the Currency.

4. The Government's preliminary review of these documents indicates that—even considering only the favorable, selectively limited subset of summary documents provided—it is improbable Robinson's business generated $83,513 in profits, that were then stored in a safe after being received in or converted to cash form.

5. For example, even assuming that (a) Robinson's business had *zero* expenses (impossible giving the inventory, shipping, marketing, etc... costs associated with a clothing business), and (b) Robinson took *zero* distributions from the business to live on (leaving open the question of how she earned legitimate income to support herself and pay living expenses), Victrexx Vivens barely eclipsed the amount of the seized Currency in terms of *total payments* received over the course of the past three years (the time period for which she provided summary information).

6. But no business has a 100% profit margin. Moreover, while Robinson only provided bank summaries showing *credits*, these summaries indicated that Robinson both (a) had bank accounts for her business and (b) regularly deposited cash into those accounts, as well as receiving electronic transfers from Shopify. Thus, it would make little sense for Robinson to store $83,513 in purported business proceeds in cash in a safe in her home when at the same time she had, and used, business bank accounts—unless she was attempting to avoid currency reporting requirements for that cash.

7. Conversely, a simpler, and more plausible, explanation as to the source of the $83,513 in Currency exists: it was cash connected to drug trafficking. This is perhaps best

evidenced by the nine pounds of marijuana packaged in nine separate bags found in a car parked in Robinson's driveway with a loaded gun and her passport in the center console, in addition to the digital scales and money counter found together in a room in her house. And unlike her online business, it *does* make sense that Robinson would keep the proceeds of her drug trafficking in cash. *See, e.g., United States v. $242,484.00*, 389 F.3d 1149, 1161 (11th Cir. 2004) ("One would be hard-pressed to encounter a dealer in narcotics who accepted a personal check or a credit card payment.") (internal alterations omitted).

8. Thus, the Currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

## NATURE OF THE ACTION

9. Procedures for this action are mandated by 21 U.S.C. § 881, 18 U.S.C. § 983, 19 U.S.C. §§ 1602-1621, and, to the extent applicable, the Federal Rules of Civil Procedure and accompanying Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions

10. This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 and 1355. These statutes confer original jurisdiction to federal district courts of all civil actions, suits, or proceedings commenced by the United States and any action for the forfeiture of property incurred under any act of Congress.

11. Venue is proper pursuant to 28 U.S.C. § 1395 because the Currency was seized in the Western District of North Carolina.

3

Case 3:22-cv-00465-GCM   Document 1   Filed 09/08/22   Page 3 of 13

12. The Currency has been seized and is now within the Western District of North Carolina.

13. Based on the following facts, verified by Detective Dennis Miller, Charlotte-Mecklenburg Police Department, Covert Operations Division, Asset Forfeiture Unit, this action seeks the forfeiture of all right, title, and interest in the Currency.

## FACTS GIVING RISE TO FORFEITURE

***Robinson's shooting into an occupied dwelling, and CMPD's subsequent discovery of the Currency and 9 pounds of marijuana.***

14. Late in the evening on February 20, 2022, CMPD responded to a shooting into an occupied dwelling call for service in the Harrison Trace neighborhood in Charlotte, NC.

15. One witness reported (*see also* ¶¶ 16-18) that he/she observed a female individual (later identified as Ashia Robinson) wearing all pink "gym attire" get out of the passenger seat of a grey sedan and then shoot (a firearm) into that same vehicle, occupied by an unknown driver.

16. The gray sedan initially drove down the road, but made a U-turn, driving back at Robinson.

17. Then, as the sedan passed Robinson, she again fired at it—missing the vehicle but hitting a neighboring household—after which Robinson got into a red Camaro and drove after the sedan.

18. Shortly thereafter, Robinson returned, parking the red Camaro in front of her house and then going inside the residence.

19. A photograph of Robinson was later shown to this witness, who identified Robinson as the shooter.

20. Consistent with this witness report, CMPD officers had observed a 9mm shell casing in the road by a red Chevy Camaro in front of Robinson's house when they arrived on-

scene.

21. Four individuals, including two minor children, were present in the house that Robinson shot into. Two bullet holes in the home were observed: one at a window of the home and one over the fireplace. Thus, the bullet appears to have entered the home at a window near the family's computer and then traveled across the living room into the wall above their fireplace.



22. During a canvass of the area (prior to the above-referenced witness report), a CMPD officer knocked on Robinson's door, which she answered in a silver dress.

23. When the officer attempted to ask Robinson questions about the shooting, she appeared apprehensive, was uncooperative, and slammed the door shut in the officer's face.

24. CMPD obtained a search warrant for Robinson's house, finding, *inter alia*, (a) 9 mm ammunition, (b) a pink sweatshirt jacket and matching pink sweatpants laying on top of the washing machine, (c) a digital scale and currency counter on a desk in one of the rooms, and (d) $83,513 in cash—comprised of $79,115 that was rubber-banded and packaged in a plastic bag in a hallway closet safe, $3,920 in a blue bank bag located in the same safe, and $478 in loose cash:



25. A search of a Toyota Highlander SUV parked in Robinson's driveway revealed, *inter alia*, (a) nine pounds of marijuana wrapped in nine clear plastic bags located inside a suitcase in the SUV's trunk and (b) a fully-loaded FN pistol in the vehicle's center console alongside (c) a passport belonging to Robinson:





26. Also, visible in plain sight on the passenger seat of the red Camaro parked in front of Robinson's house was an open Glock gun box, with two magazines but no firearm:



27. A search of the Camaro further revealed, *inter alia*, a North Carolina ID for

Robinson, and paperwork indicating the gun case was for a Glock 19 (a 9 mm pistol) with three magazines. CMPD was unable to locate the Glock and third magazine from the open gun case.

28. Robinson was arrested and charged with felony discharge of a weapon into occupied property and possession with intent to manufacture/sell/deliver marijuana.[1]

***Robinson later attempts to send a "ghost bag" with $70,170 in cash to San Francisco***

29. In addition to the distribution amounts of marijuana and drug trafficking paraphernalia found at Robinson's house alongside the Currency, Robinson's claim that the Currency represents her legitimately-derived business proceeds is further undercut by her subsequent attempt to surreptitiously transport $70,170 to San Francisco, a well-known drug source location for the east coast.

30. During an interdiction operation at the Piedmont Triad International Airport in Greensboro on August 20, 2022, K9 Eso, a properly trained and certified narcotics detection canine, was deployed on a lineup of checked passenger bags, and positively alerted to the odor of narcotics on a suitcase whose luggage tag indicated it belonged to Ashia Robinson.

31. The suitcase was taken to the flight's gate, and, at the request of law enforcement, Robinson was paged by the airline's gate attendant. She neither responded to three separate pages nor boarded the flight to San Francisco.

32. Video surveillance at the airport revealed that Robinson had instead checked the bag at the Delta ticket counter and left.

33. This method—known as sending a "ghost bag"—is common among drug traffickers or money couriers as a means of limiting or avoiding interaction with/exposure to law

---

[1] The undersigned AUSA was informed that the state criminal case was ultimately dismissed when, among other things, a witness was unwilling to testify due to concerns for his/her safety.

enforcement.

34. Robinson then returned to the airport a day later to inquire about her suitcase's whereabouts.[2]

35. On August 23, 2022, law enforcement obtained a search warrant for the suitcase, and when opened, discovered it contained $70,170 in loose currency of varying denominations wrapped in blankets:



36. A phone interview was conducted with Robinson, wherein she stated, among other things, (a) that the money was from a business she owned, Trucking Express Hauling, (b) that she was going to California for "a while" and thinking of relocating there for work, and (c) that she had packed her bag that way due to "people" stealing her items in her bags before, but couldn't remember what airports this had purportedly occurred in.

37. On its face, this explanation makes little sense: wrapping an extremely large sum

---

[2] Robinson was directed to the airport's police department and informed the bag and been detained as part of a narcotics investigation.

of cash in a towel, putting it in a suitcase, and then checking that suitcase—*i.e.* relinquishing physical control to an airline that may very well simply lose the bag and the $70,170 in it (as airlines are known to do on occasion with checked baggage)—is hardly a secure method of transporting currency for either business or personal reasons. For example, Robinson could have simply left (or deposited) the currency in either business or personal bank accounts while she traveled to San Francisco and safely accessed it from any bank location there. Similarly, Robinson could (much more safely) electronically transfer funds (whether by wire transfer, Venmo, Zelle, CashApp, etc...) to any legitimate recipient. And Robinson was hardly traveling to California for any period of time by going to the airport, checking a bag full of cash with no other travel items such as clothes or toiletries, and leaving without going through security screening or boarding her flight.

38. Rather, the fact that Robinson chose to send a ghost bag full of an extremely large amount of loose cash is, at the very least, probative of an illicit connection and/or a desire to avoid either currency reporting requirements or a paper trial for the cash. *See, e.g., United States v. $183,791.00 in U.S. Currency*, 391 Fed. Appx. 791, 795 (11th Cir. 2010) ("Although a large amount of cash alone is insufficient to meet the government's burden, it is highly probative of a connection to some illegal activity . . . legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities. In contrast, drug rings do often utilize couriers to transport large amounts of cash in rubber-banded bundles.") (internal quotations and citations omitted).

# FIRST CLAIM FOR RELIEF – THE $83,513 IN CURRENCY
## (21 U.S.C § 881(a)(6))

39. The United States incorporates by reference the allegations set forth in Paragraphs 1 to 38 above as if fully set forth herein.

40. The $83,513 in Currency is subject to forfeiture pursuant to 21 U.S.C. § 881 (a)(6) because it constitutes money furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of 21 U.S.C. §§ 841 and/or 846, is proceeds traceable to such an exchange, and is money used or intended to be used to facilitate a violation of 21 U.S.C. §§ 841 and/or 846.

41. Upon information and belief, the following persons may claim an interest in the Currency seized on February 20, 2022:

Ashia Robinson
5616 Harrison Trace Drive
Charlotte, NC 28269

*With courtesy copy to:*

Noell Tin, Esq.
Tin Fulton Walker & Owen
301 E Park Ave.
Charlotte, NC 28203

## CONCLUSION AND PRAYER FOR RELIEF

42. By virtue of the foregoing, all right, title, and interest in the Currency vested in the United States at the time of the commissions of the unlawful act giving rise to forfeiture, 21 U.S.C. § 881(h), and has become and is forfeitable to the United States.

WHEREFORE, the United States of America respectfully prays the Court that:

1. A warrant for the arrest of the Currency be issued;

2. Due notice be given to all parties to appear and show cause why the forfeiture should not be decreed;

3. Judgment be entered declaring the Currency to be condemned and forfeited to the United States of America for disposition according to law; and

4. The United States be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action, including but not limited to the expenses of maintenance and protection of the Currency as required by 28 U.S.C. § 1921.

Respectfully submitted this 8th day of September, 2022.

        DENA J. KING
        UNITED STATES ATTORNEY

        /s/ Seth Johnson
        J. Seth Johnson
        NC Bar # 53217
        Assistant United States Attorney
        Suite 1650, Carillon Building
        227 West Trade Street
        Charlotte, North Carolina 28202
        Telephone: (704) 338-3159
        Email: seth.johnson@usdoj.gov

## VERIFICATION

I declare under penalty of perjury that the factual information contained in the foregoing Complaint is true and correct according to the best of my knowledge, information, and belief.

Executed on the __8__ day of September, 2022.

_____
Dennis J Miller, CMPD Detective